2015-14-07 Mr. Isrelevitz May it please the Court, two grounds for obviousness are presented on appeal, each of which violate a fundamental principle of At several points both in the principle and reply brief, you claim some facts are undisputed. And one of them is the undisputed evidence showed no prior method enabled the purification of the prior 50-50 combination to yield a mixture enhanced in the 6S isomer. No evidence that anyone ever succeeded using Kosulich's method. The problem I have with that is you say these are undisputed facts and yet in the record the District Court discusses testimony by various experts and says Martin, Suckling and Moran all testified they believe Kosulich did that and there's no evidence that didn't happen and the journal article was never withdrawn. So how is that undisputed? I mean I can see you could argue that it was misinterpreted or some such but it's clearly not undisputed. No, the question is one of enablement and whether Kosulich herself got it once is distinct from whether she contributed a method to the art that others could repeat, which is ultimately what's required for an enabling disclosure of a method to purify the 50-50 mixture of isomers. She might have gotten it. That was a rather irrelevant issue to the trial as far as we were concerned because the question is in 1986, did she contribute an operable method to purify the isomers? If she did, we would fall dangerously. But all these people said they believed that she did. They believe she might have gotten the right product. Indeed, they don't believe, nobody testified that indeed it works for anybody else. If she got the right product, the S isomer, the pure S isomer was known, right? Made, having been made via an enzymatic process. One method or another. It was known, the S, pure S isomer. It had been made by an enzymatic process. It was known. Separate from Kosulich, indeed. Maybe it wasn't a terrific method but the method, the better method, a better method is not claimed here. This is a composition claim, right? Indeed. Not a method claim. We don't claim what we, these inventors claim what they were the first to enable. What a number of groups were trying to enable. That is, the ability to make in a commercial scale, in a practical way, what is a mixture of isomers. We claim a mixture of isomers for the very purpose that when you start with a mixture, as Kausulich tried to, you always end up with a mixture. The question is, if the pure isomer is known, is a somewhat less pure isomer not obvious? Indeed. If we are grounding, indeed it's not. What's so good about a somewhat less pure isomer? Does it have advantages over the pure isomer? It does not have a clinical advantage over the pure isomer. Indeed, if Sandoz or any other generic company wanted to use a hundred percent pure, they're more than welcome to. Okay? But indeed, it's a not obvious, if we have to ground ourselves in the prior art in obviousness, we always must. If the prior art is an enzymatically prepared, a hundred percent pure... You keep talking about the method of preparation, though, but this is not a method claim. It's a composition claim. So what does it matter whether the prior art showed one way or another? As long as there is known in the art a pure form, why isn't every other form known as well? Because it's certainly, you can go from the pure form all the way back down through the non forms. Because the only reason you would have to do that is a hindsight reconstruction of this invention, and that is... But the invention is a particular composition. It's not a method for getting there. We still need a... If we're going to focus on the hundred percent pure in the prior art, you still need a logical reason, don't we, after KSR to modify that. Isn't this a claim to a substantially pure material? Ninety-five percent? Ninety-two percent? Indeed it is. And so what logical reason existed to modify what I would say contaminate what was already one hundred percent with the undesirable known to be potentially deleterious impurity? There is none. If no logical reason... That's a very strange argument. We've had arguments for years. You know them all. You know all the cases. When you have a mixture, to get to the pure compound may be non-obvious, but to go backwards... We still are grounded in the prior art here, and we still have to find a reason to modify. It's a non-obvious alter... We all agree it's a non-obvious alteration of the prior art. There's no reason why you would do it but for the invention, but for to invalidate this claim. We all agree there's a motivation to purify the 50-50 mixture. There's no enabling process to do it until the invention. But you didn't patent the process. We did patent the process. Right, but that's not the patent we're arguing about here today. So I understand, and I may be repeating my colleague's point, that if there's this mixture out there, and nobody has discovered a pure form, and you patent the pure form, then that may be patentable as a composition claim. But when the pure form is already prior art, and you're not saying that some mixture of pure and non-pure has advantages over the pure, then how is not the 100% pure, render anything below that obvious, without resorting to language of how you do it? I think your honors are referring to the analysis akin to titanium metals. If it's sort of close enough, it's obvious. But even in titanium metals, the understanding was that the optimization around endpoints in titanium metals was an appropriate motivation to modify. What you're In other words, going to a less pure material, what makes no sense is non-obvious. Maybe you're right. And indeed, they can use the 100% pure. We are not articulating, we're not trying to block others from using the prior art. They're more than happy to allow that. But that's not what they're choosing to do, because the more practical way to get the material is still the preferred way to get the material. And the first to enable the mixture... That's the preferred method. The first to enable the claim compound is entitled to claim the compound itself. Because under Henry Hoeksema, the compound isn't in the prior art. The mixture isn't in the prior art. I don't want to interrupt. So the court found that you were arguing that there was no evidence that Kisilich obtained highly pure 6S And in fact, Drs. Martin, Seckling, and Moran all testified they believe Dr. Kisilich did so, and the court accepted that testimony as true. And it does not make Kisilich enabling. And these four groups tried, including the inventors during the prosecution of this patent, proved, they tried to repeat Kisilich and proved it doesn't work. Even American Cyanamid admitted, the owner of the Kisilich patent admitted it didn't work. All right, and that's in evidence, that's at A4246. So the court is in error in its summation of the testimony that they believe, the doctors believe that it was done. No, Your Honor, they were not in error to conclude that Kisilich described having done it. Indeed, that's what Kisilich described. And that they believed it had been done. Indeed, they believed the data was consistent with what Kisilich says she got. But there's no doubt that the district court did not reach the issue of whether Kisilich was enabling. She said as much when she said, I do not rely on Kisilich as an enabling process. What I rely on what's enabling is the idea that you can contaminate the 100% material, a completely non-obvious thing to do. So I'm sensitive to Your Honor's concern that we're withdrawing something in the prior art that was already in the prior art. But again, if somebody wants to use the 100% material, we're more than happy to permit that. Our claims do not cover that. Isn't it likely that when one is on the way to obtaining a pure product, one goes through a less pure product? I'm glad Your Honor asked that question. I think there was some element of the enzymatic process does not at all ever make a mixture. It never starts with a mixture. It completely goes around the idea of making a mixture and synthetically only makes one. It was going to be a trial issue. Santos dropped the issue whether this enzymatic process inherently made some of a mixture. They dropped that before trial, instead admitting that it's 100% pure. So the question before this court is whether a logical reason is still required to modify the prior art. And indeed, the only way you can find these claims are obvious over the small amount of 100% material, which nobody wants to use, is to conclude that, well, it just doesn't matter, that there's no reason to contaminate it. So we issue patents these days on products less desirable than the prior art. I think we're operating in a fictional world, that this enzymatic process actually solved any sort of need to produce a pharmaceutical product. The reality was, and I can give you a site to our expert, there wasn't enough enzyme to even make 10 grams of this material. The solution to the problem that was contributed by the inventors was a significant one. The solution to the problem was the process which isn't claimed. Which enabled the claimed composition, which is the key. And under Henry Hoeksema and later case law, that entitles Spectrum to claim the composition that they've enabled. We'll save the rest of your time for rebuttal, if you like, or continue with your time. I think I will. Thank you. May I please report, Deanne Maynard for Defendant Sandoz. The district court made extensive factual findings here, none of which are challenged on appeal, that require its conclusion of obviousness. Specifically, the district court found that it was well known, in fact, that the evidence was replete in the record, that the success isomer was the one that had all the from the 50-50 mixture to a highly pure form. Doesn't the opposing counsel have an argument, a reasonable argument, that if you have a pure product, who would contaminate it? Isn't that non-obvious? Isn't that what they're claiming? That is a fair summation of what he's saying, your honor, but I think there's one problem with that is, it is relevant that there was this way to make it in the art, because that takes them out of the HUCSIMA world, where you're just talking about theoretical compound. There was a known way to make it here, that would have been easy if the district court found. But more importantly, under titanium metal, there's no patentable difference between the 100% pure and the 92% to 99.99% claims in these claims, and the district court made findings that require that. The district court found that there is no meaningful difference between the compound in the claim and the 100% pure. The district court found, and their witness, Dr. Ryder, testified that the body would not know the difference between a 90% plus and a 100% pure. So absent anything else, there's nothing patentable, and it is obvious. All we're talking about here is the metha-patent expired. That's not being asserted here. The district court found, in fact, that the enzymatic process, which is the process that makes 100% pure, and the district court found, in fact, that the 100% pure, the enzymatic process, actually had only 95% success. The other impurities, and Sandoz did not concede, but Sandoz did not try to prove at trial that the other impurities might or might not contain some 6R. But in any event, the important point is, the district court found there's no meaningful difference to the body between the compound that's claimed here and the compound in the prior art. That makes it obvious under titanium metal. It's also obvious under Aventis, because this was the factual. Everyone knew that 6S was the active isomer. Dr. Krasulich, in fact, separated it in 1952, finding a fact 94, she obtained highly pure 6S. Their witnesses didn't dispute that. They did try to show... They could not replicate it. They couldn't prove that several people could not replicate it. They sought a finding of fact from the district court, but that Dr. Krasulich's The district court did not make that finding. The district court instead found that Dr. Krasulich had, in fact, succeeded. The district court also found, and the patent specification here concedes in column 2, that prior art methods had succeeded in separating the 50-50 mixture, both by fractional crystallization, which is the method Dr. Krasulich used, and by chromatography. The specification also concedes that the prior art had succeeded in making, enzymatically, 100% pure S. The district court relied on all of this information to conclude that a person of skill in the art would have had reasonable success in separating the isomers one way or the other. That, under Aventis, that's a stronger case than obviousness under Aventis, because here we had an explicit teaching in the art that the 6S, it was known, as Judge Lurie pointed out, that the 6S was the active isomer. It had, in fact, been separated. Someone had already, in fact, created substantially pure 6S. The question for obviousness is not whether the Krasulich patent is itself enabled, although, of course, it's presumed enabled, and the district court didn't find that they proved it wasn't. The question is whether all of the art, including those that the district court found, would suggest that a person of skill in the art would have success at arriving at the isomer, establish that, and fade. Indeed, the district court found that the motivation, the strong motivation developed in the mid-1980s to separate these isomers because of a new treatment that had begun in the early 1980s, the 5FU treatment. They used much more leucoborin, and there was a research hypothesis that the 6R might have worked to the strong motivation to separate the isomers, and that in short time, many succeeded. But if you have, if the pure material is known, what's the motivation to contaminate it, to make it impure, which is what the claims cover? Well, we don't have to show that motivation, Judge Lurie, as the district court correctly found. The fact that the 92 to 99.99% is insubstantially different, biologically equivalent to the body, to the 100% pure, is alone enough. That's why no one would do it, because you're just adding impurities to it. But that doesn't make it patentable. In fact, that just under titanium metals, that makes it obvious. If no one would do it, isn't it non-obvious? No, Your Honor, not under the law. Now, to be sure, if they might have been able to show some unexpected properties or other secondary considerations, If the 92 to 95% mixture were better, because it had some R in it, in the 100%, then that might be patentable. That would be a much tougher case. But in fact, we have the opposite here. Their witness conceded there was no benefit, and he conceded here. And the district court failed, which is the most important thing. The district court made a finding of fact. There was no meaningful difference between the compounds claimed and the 100% pure. If you have questions about the non-infringement arguments, I would like to address that. If not, however, I'll... Apparently not, Ms. Maynard. Mr. Israelowicz has a little under four minutes for rebuttal. As Judge Lurie, as you pointed out, it's a completely non-obvious thing to do. And I almost need say no more, because if KSR still requires a motivation to modify the art, again, we always have to start with the prior art. If Kauslitz must be enabling, it would be on all fours with Aventus if Kauslitz was enabling. Aventus is quite distinct. There were two different prior references that said, here's the way to do it, and you can purify the 50-50 mixture. There was an enabling art to get to where you needed to go in Aventus. That's why we spent so much time in the trial showing that Kauslitz was not enabling. Not that Kauslitz got the data and optical rotation that was appropriate, that she didn't contribute a method to purify the isomers to one of ordinary skill in the art. One of ordinary skill in the art in 1986 couldn't make this composition but for the invention. Now, could they adulterate the little bit of 100% that was in the prior art? Yeah, I think they probably could have taken a medicine dropper and have done that, but why would they do that? We're not required to show unexpected results. They're required to show a motivation to modify the art. Ultimately, the burden rests with them to show by clear and convincing evidence that there was a motivation. Kauslitz, my friend, was just up here saying, we don't need to show that. Indeed, you always need to show motivation to modify the prior art. If the prior art's starting place is the 50-50 mixture, we have motive all day. We just don't have an enabling way to do it. If the prior art is 100%, we have an enabling way to do it but no motivation to get there. Whether your honors think this is just a little bit worse than the prior art, it isn't. There's no way to make buckets of this stuff to make a pharmaceutical. Ultimately, we claim a pharmaceutical. No pharmaceutical company in their right mind in 1986 would have made a pharmaceutical based on an enzymatic process that yielded less than a gram of material and could be scaled up maybe to 10 grams. So you invented a process. No, we were the first to enable what was needed to make this drug. And that's why we can claim the drug. Thank you. We'll take the case under advisement. Mr. Israelowitz, I see you tried the case. I hope you had an opportunity to visit some of Las Vegas' swell restaurants. I practiced law there for 19 years. All rise. The honorable court is adjourned until tomorrow morning. It's at o'clock a.m.